**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

CASE NO. 1:25-cr-00123-DDD-1

UNITED STATES OF AMERICA,

    Plaintiff,

v.

ISHMAEL PETTY,

    Defendant.

---

**RESPONSE IN OPPOSITION TO MOTION TO CONTINUE ARRAIGNMENT**

---

Ishmael Petty, through counsel, submits the following response in opposition to the government's Motion to Continue Arraignment (ECF No. 19).

**BACKGROUND**

Since October 16, 2017, Mr. Petty has been housed in Cell 40, Range 13 of the United States Penitentiary, Administrative Maximum facility in Florence, Colorado ("ADX"). The ADX is the most restrictive federal prison in the United States. Established in 1994, it houses less than one quarter of one percent of all people incarcerated in federal custody. These are people whom the BOP has classified as the "most violent, predatory, disruptive, and escape-prone" in federal custody.[1]

Within the ADX prison, Range 13 is reportedly the most isolated and secure area of the

---

[1] *See*, U.S. Dep't of Just., Report and Recommendations Concerning the Use of Restrictive Housing – Final Report (January 2016), https://www.justice.gov/dag/file/815551/dl.

1

ADX.  The ADX operates a Secure Housing Unit (SHU) on C Unit, which is designated as a short-term housing unit for disciplinary punishment; Range 13 is an even more isolated and more austere housing unit than the SHU.  Range 13 is comprised of four single-inmate cell "suites" designed to ensure zero physical contact between inmates, and between inmates and staff.  Each cell is approximately the size of a parking space and is connected to a sallyport, which in turn connects to a small "law library" (a small space with a stool and computer access).  Each cell in Range 13 is also connected to an outdoor recreation area, and an indoor recreation area.  Cells 10 and 20 share an indoor recreation area; Cells 30 and 40 share an indoor recreation area.  But inmates are prohibited from being in the shared rec area at the same time.  All inmate movement within each cell suite is controlled by doors operated by remote control.  The only human contact comes from being handcuffed by staff for movement and strip searches conducted by staff.

Conditions on Range 13 are more isolating than any other housing area at the ADX.  An ADX psychologist reported to the Office of the Inspector General (OIG) that due to this heightened level of isolation, confinement on Range 13 amounts to a form of torture:  "You have no contact, you don't speak to anybody, and it's a form of torture on some level."[2]

Lamarcus Hillard died on September 19, 2020 on Range 13 at the ADX.  On the date of his death, Mr. Hillard was housed in Cell 30; Mr. Petty was housed in Cell 40.  Movement on Range 13 was strictly controlled by the control room.  At no time were Mr. Hillard and Mr. Petty permitted to use the indoor recreation area at the same time or have any interaction with each other.  Policy required that the lights remain on at all times when either Mr. Hillard or Mr. Petty was in the

---

[2]  Office of the Inspector General, U.S. Department of Justice, *Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness* (July 2017) (hereinafter OIG Review, p. 16. https://oig.justice.gov/reports/2017/e1705.pdf

2

recreation area. Policy required that the windows into the indoor recreation area remain clear so the monitoring cameras had a clear view into the area. Staff was supposed to monitor the area through regular rounds and by monitoring the cameras that displayed the indoor recreation area.

At 9:12 a.m. on September 19, 2020, Mr. Hillard was found unresponsive in the indoor recreation area between Cells 30 and 40. The cause of death was ligature strangulation. Mr. Hillard was alone in the indoor recreation area. The lights were out. The windows into the indoor recreation area had been covered.

Given the circumstances of Mr. Hillard's death, the Bureau of Prisons (BOP) conducted an investigation which resulted in an After-Action report that was completed on or about August 10, 2021. As noted in the After-Action report, there were many institutional failures that contributed to Mr. Hillard's death.

- Had staff not turned the lights out when Mr. Hillard was in the indoor recreation area, staff would have seen Mr. Hillard binding his own limbs and slipping a ligature around his neck in the minutes before his death, and acted quickly to stop him.

- Had the staff conducting rounds paid attention, they would have noticed that Mr. Hillard covered the windows on the indoor recreation door, which blocked the view into the area against policy, and they would have interrupted the incident.

- Had the staff who monitored the camera that looked into the indoor recreation area from the control room paid attention, they would have realized they could not see into the room and would have acted to interrupt the incident.

- Had cell searches in the weeks and days before the homicide been competently (and truthfully) completed, the ensuing tragedy could have been avoided.

- Had staff heeding Mr. Hillard's warnings and requests to be moved, rather than dismissing his written submissions as improperly labeled, the two men would have been separated and the death prevented.

- Had the food slot between the recreation room and Mr. Petty's cell been inspected, staff would have found the compromised portal that contributed to Mr. Hillard's death. Better

still, if the unapproved food slot had never been installed in the first place, the homicide could not have taken place.[3]

Despite the fact that the After-Action report was completed in August 2021, marking the completion of the investigation as to the causes of Mr. Hillard's death, the government waited until April 8, 2025 to bring this indictment.

At least one BOP document concluded that Mr. Hillard's death was a suicide (BOP Response to FOIA request 2021-05115, September 9, 2021).

### SPECIFIC BACKGROUND FOR THE NOTICE OF WITHDRAWAL OF CONSENT TO APPEAR VIRTUALLY OR REMOTELY AND DEMAND FOR COMPLIANCE WITH RULE 43

As stated by AUSA Dunn, the undersigned and Mr. Dunn, along with AUSA Winstead spoke on April 10, 2025. During that conversation, the undersigned (Mr. Burke) was notified that an indictment had been returned. It was agreed that the Initial Appearance could be accomplished by VTC at the ADX. On April 11, 2025, when the undersigned (Mr. Burke) hadn't been notified of the date for the Initial Appearance, he contacted the Court's chambers inquiring about the date for the Initial Appearance. Ms. Mullendore informed the parties that, "No initial appearance has been set. It is the Court's understanding that because the defendant is already in federal custody, the

---

[3] Sealed after it served as the literal conduit for Mr. Hillard's death, the unapproved food slot begs a pair of urgent questions. Why was it constructed anyway? And if there was good reason for its existence, why not seek approval? The second question is academic. Mr. Matevousian, the high ranking BOP official who authored the After-Action report, said the food pass would surely have been rejected had BOP officials adhered to proper review channels. "Due to the wall separating an inmate sleeping area from the indoor recreation yard, which are considered two different types of occupancies as defined by the National Fire Protection Association (NFPA), this would be denied if submitted today," he wrote.

government needs to file a motion for a writ. When a writ is issued, the initial appearance will be set on the calendar of the duty magistrate judge." After some follow-up emails, Magistrate Judge Neureiter set the Initial Appearance and Arraignment for April 16, 2025 at 2:00 p.m., by VTC.

The undersigned (Mr. Burke) has had many hearings at the ADX in Capital cases. Heretofore, they have all been in the courtroom on the first floor of the ADX. It was counsel's expectation based on prior experience, that the Initial Appearance, and possibly the Arraignment, would take place in that courtroom at ADX. Though small, this courtroom lends some dignity to the proceedings. Never before was a client placed in a cage for a court proceeding at the ADX. As would become clear, the cage does not afford counsel and client the ability to meaningfully communicate during proceedings.

Moreover, the undersigned (Mr. Burke) requested a meeting with Mr. Petty prior to the Initial Appearance, at 11:00 a.m. on April 16, to have a meaningful attorney-client conversation before the Initial Appearance. This request could not be accommodated by the BOP. As a result, the undersigned did not meet with Mr. Petty until approximately 1:45 p.m. on Wednesday, April 16. Mr. Petty was already in the cage wearing a red jumpsuit. Earlier in the day, Mr. Petty had been wearing plain khaki clothing. The BOP directed that Mr. Petty change into a red jumpsuit before he was placed in the cage for the purpose of the public Initial Appearance. BOP dressed Mr. Petty in a red jumpsuit and put him in a cage to create a certain public image of Mr. Petty that it wanted broadcast into the courtroom for public consumption and to prejudice these proceedings.

During the Initial Appearance, the undersigned made a record regarding the impropriety of the setting. When Magistrate Judge Neureiter asked Mr. Petty if he'd had a chance to review the indictment, Mr. Petty honestly stated, "No." THAT is the reason that the arraignment didn't take place on April 16. The undersigned and Mr. Petty had not had a chance to review the indictment

5

together.  Magistrate Judge Neureiter realized that Mr. Petty could not be arraigned because Mr. Petty had not had an opportunity to review the indictment nor consult with counsel regarding it.  It is the undersigned's memory that it was Magistrate Neureiter who, *sua sponte*, set the matter over to Monday, April 21 at 10:00 a.m. on Magistrate Judge O'Hara's docket.

The undersigned met again with Mr. Petty at the ADX the next morning, on Thursday, April 17, 2025.  Following that meeting, the defense took the only logical step given the events of the day before – the undersigned filed the Notice of Withdrawal of Consent to Appear Virtually or Remotely and Demand for Compliance with Rule 43 at approximately 1:05 p.m.  At 3:37 p.m., the government filed its Motion to Continue Date of Arraignment.

Mr. Petty has a right to be present with counsel in Court for his Arraignment.  The Government has determined to seek the death penalty for Mr. Petty.  They have had more than four years to prepare for the Initial Appearance and Arraignment, to make whatever arrangements they feel are necessary to transport Mr. Petty.  When it indicted the case, the government knew that the Court would be setting an appearance within a matter of days.  *See* Fed. R. Crim. P. 5 (a defendant must be taken before a Magistrate Judge "without unnecessary delay" for his initial appearance); Fed. R. Crim. P. 43(a)(1) (defendant must be physically present at the initial appearance).   The government had sole control over when this case was charged.  To the extent that logistical issues might arise, the government should have been "adjust[ing] staffing rosters" before the indictment was filed.  It is simply incomprehensible that they failed to prepare for the pragmatic necessities of the Arraignment and now alleges that a continuance is necessary.

## **RECOMMENDATION**

Because Mr. Petty must come to Denver, presumably a Writ must issue.  The U.S. Marshal customarily handles such Writs.  Frequently, the U.S. Marshal will go down to the ADX on the

morning of a hearing. They could have Mr. Petty in one of their holding cells before court. And then bring Mr. Petty to Magistrate Judge O'Hara's courtroom shortly before 10:00 a.m. A BOP SORT team is irrelevant to these proceedings. The BOP needn't, and shouldn't, insert itself into this process. The U.S. Marshal knows how to handle these situations. In fact, during the trial in July 2015, the U.S. Marshal transported Mr. Petty many times without any incidents whatsoever.

For the reasons set forth above, the Court should deny the government's Motion to Continue the arraignment scheduled for April 21, 2025 at 10:00 a.m.

Respectfully Submitted,

*s/ Patrick J. Burke*
Patrick J. Burke
Patrick J. Burke, P.C.
303 16th Street, Suite 200
Denver, CO 80202
(303) 825-3050
Patrick-j-burke@msn.com

*s/ David G. Maxted*
David G. Maxted
Maxted Law LLC
1543 Champa Street Suite 400
Denver, CO 80202
(720) 717-0877
dave@maxtedlaw.com

**Counsel for Ishmael Petty**

**CERTIFICATE OF SERVICE**

I hereby certify that on April 18, 2025, a true copy of the foregoing document was electronically filed via CM/ECF which will serve electronically all counsel of record in this case.

*s/ Jennifer J. Feldman*