IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 25-cr-123-CNS

UNITED STATES OF AMERICA,

       Plaintiff,

v.

ISHMAEL PETTY,

       Defendant.

---

## Motion to Disqualify

---

Ishmael Petty, through counsel, moves to disqualify the presiding judicial officer in accordance with 28 U.S.C. § 455(b)(1) as the judge obtained information related to disputed issues in this case from extrajudicial sources during ex parte communications that occurred on March 24, 2206. In the alternative, Mr. Petty seeks disqualification under 28 U.S.C. § 455(a) as, given events that occurred on the tour, the judge's impartiality might reasonably questioned.[1]

### Factual Background Regarding the Basis for Disqualification

Mr. Petty has been imprisoned at ADX since 2003. He is serving a life sentence plus 60 years after convictions for murdering his cellmate at USP-Pollock and assaulting three staff members at ADX. For the last 8 years, he has been housed in the most

---

[1] *Certificate of Conferral:* Counsel has conferred with AUSA Brian Dunn and is authorized to state that the prosecution opposes the relief requested.

1

secure wing of the facility, Range 13. Range 13 is part of C Unit and consists of 4 cells – cells 10, 20, 30 and 40.

On September 19, 2020, Mr. Petty was assigned to Cell 40 on Range 13 and Lamarcus Hillard was assigned to Cell 30. That morning, ADX staff allowed Mr. Hillard to go into the indoor recreation area between Cells 30 and 40. ADX staff then turned off the lights inside the indoor recreation area. A while later, Mr. Hillard was found by ADX staff hanging from a noose that went through the food slot between Cell 40 and the indoor recreation area. Mr. Hillard died from his injuries. An After-Action Report prepared by the BOP following Mr. Hillard's death details a series of staff blunders and policy violations that contributed to Mr. Hillard's death, and outlines recommendations to prevent a similar tragedy in the future. Ex. A.

More than four years later, Ishmael Petty was charged with the murder of Lamarcus Hillard. ECF No 1. The government has filed a Notice of Intent to seek the death penalty. ECF No. 7. Among the aggravating factors the prosecution intends to rely on to justify a death sentence are that Mr. Petty "is a continuing danger to the lives and safety of other persons" and that Mr. Petty "is likely to commit criminal acts of violence in the future." *Id*. As Mr. Petty is serving a life sentence, these aggravators require the prosecution to show that Mr. Petty is a danger to the "lives and safety" of persons inside ADX and that he is "likely to commit criminal acts of violence" while incarcerated at ADX.

At a status conference on January 22, 2026, the judge advised the parties that she believed a tour of ADX was appropriate given the anticipated upcoming motions practice in the case: "I think it would be helpful as this case goes forward that we all

2

know what we're talking about and referencing when we see motions and whatnot." . ECF No. 140, Trans. of 1/22/26 Conf., p. 9. The Court stated: "Both sides would need to be there, obviously, for that tour" and, barring objection from either party, requested that the parties confer with her judicial assistant regarding scheduling the tour. *Id*. at 8. After neither side objected, the tour was set for March 24, 2026.

In early March, the parties filed competing motions that revolved around BOP's ability to monitor and capture audio and video footage of Mr. Petty on Range 13. ECF Nos. 173, 176. One issue of dispute was whether a camera installed in the sallyport area of Mr. Petty's cell was operational. The parties also disputed whether BOP had the ability to preserve the audio feed in Mr. Petty's sallyport area that captured his interactions with BOP staff. *Id*. These motions were not yet fully briefed by the March 24 tour.

On March 11, 2026, the defense sent a list of locations it believed should be included in the tour because they would be relevant to anticipated litigation in the case. Ex. B, pp. 3-4. That list included: Range 13 (all cells, rec areas, the interior of the pipe chase access for Cell 40, inside the door across from Cell 40, and the staff stairway/hallway above the pipe chase area); the C Unit Bubble; ADX visitation rooms; ADX gym; a control unit cell; and a general population unit cell. *Id*., 3/11/26 email. When the government responded that the Warden of ADX had only authorized a tour of parts of Range 13, the Court asked the defense to provide a brief explanation of why it believed touring the other areas was important. *Id*. pp. 2-3.

The defense provided the requested information. Ex. C, attachment to Burdick 3/18/26 email. As pertinent here, the defense related that the tour should include the C

3

Unit bubble (aka the control room) because audio and video feeds on Range 13 are monitored there and the parties were actively litigating access to recordings from those feeds. The defense also explained that whether ADX had changed its monitoring of the audio/video feeds in Mr. Petty's cell after the Hillard incident—as recommended in the After-Action Report—was a contested fact regarding the government's claim that Mr. Petty is a future danger. *Id*. Finally, the defense noted that viewing the screens inside the bubble would permit an understanding of what ADX officers could have observed on Range 13 on the day of Hillard's death. *Id.* Regarding the door immediately across from Mr. Petty's cell, the defense noted Mr. Petty's concerns that ADX staff utilizes this door to access parts of his cell that are away from his view for purposes of tormenting him, and that the staff's actions were likely to be litigated in the case. *Id*.

The next day, the government responded to the defense's explanation as to why these areas were necessary to tour. Ex. B, pp. 1-2. The government emphasized that the Warden had only authorized a tour of Cells 30 and 40 and the indoor and outdoor recreation areas that accompany those cells. The government asserted that "[a]llowing the defendant to gain knowledge of certain areas requested [including the door across from his cell] amounts to a significant security risk." *Id*. The government stated: "**If the Court is considering a request to tour any other area, BOP has requested an opportunity to be heard.**" *Id*. (emphasis in original). There was no indication that this "opportunity to be heard" would occur ex parte or that Mr. Petty and his counsel would be denied the ability to respond to any issue raised by the BOP.

On March 19, 2026, the Judge's judicial assistant sent to the final communication regarding which parts of ADX would be included on the tour:

4

> Judge Sweeney is fine to proceed with the tour as confirmed by the Warden, but it should also include viewing of the inside of the door across from Cell 40 and the fire exit for that side of the range. She also believes that, given the pending issues concerning video footage, it is important to see the C Unit bubble, if not on this tour then during one at some time in the future. Obviously arranging to see the C Unit Bubble on the upcoming tour is preferrable than a return visit.

*Id.* p. 1.

On March 24, the tour participants gathered at ADX. Present at ADX for the tour were: Judge Sweeney and her two law clerks, two attorneys on behalf of the prosecution, and four attorneys on behalf of Mr. Petty. Given the prior correspondence, the defense team understood that, during the tour, all participants would be permitted to view the inside of the door across from Cell 40 and that either everyone would see the C Unit bubble during this tour or everyone would return another time to view the bubble.

After passing through security, the tour participants were brought into ADX's courtroom. ADX attorney Brandon Willms then approached Judge Sweeney and said that the Warden would like the chance to greet her. Judge Sweeney accompanied Attorney Willms out of the courtroom, presumably to the Warden's nearby office. They did not return for more than ten minutes. None of the defense attorneys or prosecution attorneys were present during this meeting. No record was made of the conversation. Nothing said therein was tested by the adversarial process.

When Judge Sweeney rejoined the other tour participants, she was accompanied by ADX Attorney Willms and Warden Jones. The group was then escorted into the secure part of the facility by Warden Jones and three members of the ADX legal team, attorney Brandon Willms, attorney Megan Marlow, and paralegal specialist Kara

5

Reichert. The participants were taken to Range 13 on C Unit, where they were all shown Cell 40, the outdoor recreation area for Cell 40, the indoor recreation area between Cells 30 and 40, Cell 30, and the outdoor recreation area for Cell 30 in two groups.

While the first group waited for the second group to finish looking at Cell 30 and its recreation area, a discussion began between Judge Sweeney, some of Mr. Petty's attorneys, and the ADX attorneys regarding whether the group would be shown the inside of the door across from Cell 40 (the prosecution was also present but not actively participating in the conversation). ADX Attorney Marlow stated that accessing the door across from Mr. Petty's cell required certain security authorizations that had not been obtained and required paperwork that had not been completed. Marlow reiterated the Warden's prior position that the tour participants would not be permitted to see behind the door on the tour. Given this seemingly unmovable position, there was discussion of whether the parties could petition for a protective order that would permit viewing of the area behind the door. Judge Sweeney encouraged the parties to discuss the issue and file a motion if agreement could not be reached. It was counsel's understanding that the issue was closed for the day and that litigation would be required before anyone— including Judge Sweeney—would be permitted to view the area behind the door.

Once the entire group was back together, Warden Jones, Judge Sweeney, and members of the ADX legal department began moving towards the C Unit bubble. When prosecution and defense attorneys began following them to join in the viewing of the bubble, Judge Sweeney informed counsel that the Warden had agreed to show her inside the bubble but that neither side's counsel could be present. This statement

6

represented a reversal from the Court's position set forth in the March 19 email that either everyone would see the bubble during the March 24 tour or another tour would be scheduled for a later date.

Counsel was made to move back into the hallway outside of Cells 30 and 40 while Judge Sweeney went with Warden Jones and members of the ADX legal team into the C Unit bubble. No record exists as to what occurred during this private viewing of the bubble, including whether audio/video feeds were shown to Judge Sweeney, or what conversations occurred. As there is always an ADX correctional officer staffing the control room, at least one correctional officer was present during these conversations and may have participated therein. It is unknown which correctional officer was assigned to that position at the time of this ex parte conversation or whether such officer is anticipated to be a witness at the trial of this matter.

After the ex parte meeting in, and viewing of, the C Unit bubble, the parties were informed that the Warden had agreed to show Judge Sweeney and her staff the area behind the door across from Mr. Petty's cell, but that the parties' attorneys would not be permitted to be present during this process. Judge Sweeney had apparently assented to the Warden's proposal, in another reversal from her prior position. Attorneys for Mr. Petty and the prosecution were removed from C Unit altogether and made to wait in the main hallway while the Judge and her staff remained inside. It is unknown what parts of C Unit and/or Range 13 were shown to the Judge and her staff. No record exists as to the conversations that occurred during this period.

During the ex parte communications that occurred on March 24, the Court obtained information about matters in dispute in this case from extrajudicial sources. As

set forth below, receipt of such information outside of the adversarial process undermines impartiality and requires disqualification of the presiding officer.

### ADX Employees—including the ADX Warden—are Not Disinterested Experts or Neutral Figures in This Litigation

As this case remains in the early stages, it is impossible to predict all of the different issues that may arise as the case proceeds. But in other capital litigation, jurors have been asked to consider the following as mitigating against imposition of the death penalty:

- From *U.S. v. William Sablan*, Case No. 1:00-cr-531-SKC-1, ECF No. 2501:
    - Whether the circumstances that led to the death of another inmate existed, at least in part, due to the failure by BOP officials to do their job;
    - Whether correctional officers failed to respond to duress alarms;
    - Whether a correctional officer failed to intervene to prevent an inmate's death;
    - Whether correctional officers were aware that an inmate posed a risk to another inmate and failed to take appropriate steps to mitigate that risk;
    - Whether a BOP facility failed to conduct appropriate psychological testing, evaluation and treatment;
- From *U.S. v. Rudy Sablan*, Case No. 1:00-cr-531-SKC-2, ECF No. 2959-8:
    - Whether housing assignments contributed to the death of an inmate;
    - Whether BOP officials' failure to follow policies contributed to the circumstances that led to an inmate's death;

      o   Whether the guards' failure to do 30 minute rounds contributed to the death of an inmate.

Considering the multiple significant failures outlined in the After-Action Report prepared following Hillard's death, it is anticipated that many similar issues will be presented to the jury in this case. All of the above listed factors relate to issues over which the ADX Warden has authority. Many of these factors involve actions taken (or not taken) by ADX correctional officers who work on Range 13. None of the ADX employees who communicated with Judge Sweeney on an ex parte basis are neutral figures in this litigation.

The Warden is the chief executive officer of ADX and is responsible for every decision made within the institution. *See* 28 C.F.R. § 500.1. He is the institution's final decision-maker with respect to issues such as security and inmate custody and housing. *See, e.g.*, BOP Program Statement 5100.08 CN-2 (warden role in inmate security designation and custody classification); BOP Program Statement 5270.012 (warden involvement with inmate placements in Special Housing Units); 28 C.F.R. § 541.41(a) (inmate placement into control units). The Warden also makes routine decisions regarding personnel and staff management. *See, e.g.*, BOP Program Statement 2100.04 (budgeting and appropriations of funding); BOP Program Statement 1221.66 (appointing directives managers and implementing directives manuals). For the last 23 years, the ADX Warden has controlled—either directly, by delegation, or by policy—where Mr. Petty lives, what he eats, what belongings he can possess, when he can go outside, how he moves about the facility, and so on.

The ADX Warden's responsibilities extend to matters that go directly to the heart of this case. He makes decisions on inmate housing and has exclusive control over whether an inmate is placed in administrative detention or housed on Range 13. *See* 28 C.F.R. § 541.20 *et seq*.; *see also* Ex. A, p. 23 (noting that whether an inmate should be housed on Range 13 is a "classification decision that falls within the sound correctional judgment of the ADX Warden."). Thus, the ADX Warden in 2020 (not Warden Jones) made the decision to house Mr. Petty on Range 13 and to put Mr. Hillard in the cell next to him. Had Mr. Hillard not been moved to Cell 30, the circumstances that led to his death could not have occurred. Though Warden Jones was not responsible for that decision, he is now in charge of Mr. Petty's housing assignment on Range 13.

At the time of Hillard's death, the then-ADX Warden was responsible for setting the policies that dictated operations on Range 13 relevant to this case, including the timing and frequency of staff rounds and cell searches, whether lights should be on or off when inmates were utilizing recreational areas, and what personal property can be maintained in a cell. Warden Jones is responsible for making those same decisions and setting those same policies now. Whether or how policies have changed since the events underlying this case, and whether or how such policies are being enforced now and will be enforced in the future, are issues that will be disputed at trial.

As the current ADX Warden, Warden Jones is a potential, if not likely, trial witness given the aggravating factor that Mr. Petty is a "future danger." In capital cases where the government is alleging the defendant is a continuing danger, the ADX Warden is commonly called to testify at trial about the risks and challenges of housing the defendant. For example, in *United States v. Caro*, 597 F.3d 608, 618 (4th Cir. 2010),

10

the defendant strangled another inmate. During the penalty phase of his capital trial, the government called the ADX Warden to testify about how ADX would struggle to safely house the defendant on a long-term basis and that "no system that the Bureau of Prisons has been able to devise to control the inmate is completely failsafe." Similarly, in *United States v. Johnson*, 223 F.3d 665, 671 (7th Cir. 2000), the government called an associate warden from ADX to testify during the penalty phase in rebuttal to the defense position that the defendant could be safely housed at ADX for the rest of his life. And in *United States v. Tsarneav*, the prosecution called the ADX Warden arden as a rebuttal witness to the defense expert on future dangerousness. Dist. Mass. Case No. 13-cr-10200-GAO, ECF No. 1701, p. 51. The prosecution is pursuing exactly these kinds of arguments in this case, making it possible—if not likely—that Warden Jones testifies at Mr. Petty's trial.

Similarly, the ADX legal department works closely with the prosecutors on nearly every aspect of this case. Much of the discovery produced to date was collected and processed by the ADX legal staff. When the defense has requested additional discovery from the prosecutors, those requests have often been routed to ADX legal department, who then handles gathering the responsive materials. Likewise, when the defense has requested information from the ADX legal department, it has been referred to the U.S. Attorney's Office to obtain such information through the discovery process. In short, the ADX legal department works hand-in-hand with the prosecutors pursuing the death penalty against Mr. Petty.

Finally, many of the ADX correctional officers who currently work in the facility were employed in the same or similar positions at the time of Hillard's death. While

11

there is no record showing which of the C Unit officers communicated with Judge Sweeney during the March 24 tour, each of these officers has personal knowledge of information relevant to this case, either at the guilt/innocence phase or the penalty phase. Even those who may not have been so employed in 2020 have all since interacted with Mr. Petty on Range 13. Most officers also likely interacted with Mr. Hillard before his death. None of the C Unit officers are disinterested experts or otherwise neutral persons with respect to this case.

### Disqualification is Mandatory When Impartiality is in Question

"The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases." *Marshall v. Jerrico, Inc.,* 446 U.S. 238, 242 (1980); *see also In re Murchison*, 349 U.S. 133, 136 (1955) (the right to trial by an impartial judge "is a basic requirement of due process."). Actual bias in a proceeding is not the standard; "any tribunal permitted by law to try cases and controversies not only must be unbiased but also must avoid even the appearance of bias." *Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145 (1968).

The Code of Judicial Conduct, adopted by the Judicial Conference of the United States, states: "A judge shall disqualify himself in a proceeding in which his impartiality might reasonably be questioned...." Code of Judicial Conduct, Canon 3(C)(1) (available at https://www.uscourts.gov/file/25752/download) (accessed April 21, 2026). The examples listed for when a judge should disqualify themselves because of concerns regarding the appearance of impartiality include when "the judge has personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." *Id*. Canon 3(C)(1)(a). The "proceeding" as used in that

12

section, is defined to include "pretrial, trial, appellate review, or other stages of litigation." *Id.*, Canon 3(C)(3)(d). Thus, a judge should recuse when they have personal knowledge of facts that are likely to be disputed at any phase of a case.

In 1974, this Canon of Judicial Conduct was codified when Congress enacted 28 U.S.C. § 455. In their current form, Sections 455(a) and 455(b)(1) provide in relevant part as follows:

> (a)    Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
>
> (b)    He shall also disqualify himself in the following circumstances:
>
> (1)    Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

Section 455(a) is the "catch-all" provision and requires a judge to recuse if she "concludes that sufficient factual grounds exist to cause an objective observer reasonably to question the judge's impartiality." *United States v. Cooley*, 1 F.3d 985, 992 (10th Cir. 1993) (citing *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 861 (1988); *see also Liteky v. United States*, 510 U.S. 540, 548 (1994) (describing § 455(a) as a "'catchall' recusal provision, covering both 'interest or relationship' and 'bias or prejudice' grounds")). The purpose of Section 455(a) is "to promote public confidence in the integrity of the judicial process." *Liljeberg*, 486 U.S. at 860 (citing S.Rep. No. 93-419, p. 5 (1973); H.R.Rep. No. 93-1453, p. 5 (1974)). Whether a judge is actually biased against a party or litigant is immaterial to the recusal inquiry because § 455(a)

13

"concerns not only fairness to individual litigants, but, equally important, it concerns 'the public's confidence in the judiciary, which may be irreparably harmed if a case is allowed to proceed before a judge who appears to be tainted.'" *Alexander v. Primerica Holdings, Inc.*, 10 F.3d 155, 162 (3d Cir.1993) (quoting *In re School Asbestos Lit.*, 977 F.2d 764, 776 (3d Cir. 1992)).

Section 455(b)(1) is more narrow and requires a judge to disqualify herself only if "[s]he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455(b)(1). The purpose of § 455(b)(1) is to ensure "deliberate, unbiased fact finding." *United States v. Alabama*, 828 F.2d 1532, 1546 (11th Cir.1987). Under this provision, a jurist cannot be disqualified based on facts learned through pleadings or proceedings conducted in open court. *See In re Grand Jury 95-1*, 118 F.3d 1433, 1438 (10th Cir. 1997). For § 455(b)(1) to mandate disqualification, the judge's "personal knowledge" of the disputed facts must come from an "extrajudicial source." *See United States v. Widgery*, 778 F.2d 325, 328 (7th Cir. 1985).

Whether information is obtained from an "extrajudicial source" does not turn on when the information was learned; the key is whether a record was made of the information and whether it was tested by the adversarial process. As explained in *Edgar v. K.L.*, 93 F.3d 256 (7th Cir. 1996):

> The point of distinguishing between "personal knowledge" and knowledge gained in a judicial capacity is that information from the latter source enters the record and may be controverted or tested by the tools of the adversary process. Knowledge received in other ways, which can be neither accurately stated nor fully tested, is "extrajudicial."

14

*Id*. at 259. The Tenth Circuit has recognized that an example of information obtained from an "extrajudicial source" includes where a jurist personally witnesses some event that relates to an issue to be litigated in the case. *United States v. Page*, 828 F.2d 1476, 1481 (10th Cir. 1987) (Section 455(b)(1) applies "to knowledge which the judge obtained extrajudicially, *e.g.*, through prior representation of a party, or by witnessing the events at issue in the proceeding.").

### A. Ex Parte Communications Like Those That Occurred Here Violate the Judicial Code of Conduct and Warrant Disqualification

The Judicial Code of Conduct disallows ex parte communications except in certain designated circumstances not applicable here. Canon 3(A)(4) provides:

> A judge should accord to every person who has a legal interest in a proceeding, and that person's lawyer, the full right to be heard according to law. Except as set out below, a judge should not initiate, permit, or consider ex parte communications or consider other communications concerning a pending or impending matter that are made outside the presence of the parties or their lawyers.  If a judge receives an unauthorized ex parte communication bearing on the substance of a matter, the judge should promptly notify the parties of the subject matter of the communication and allow the parties an opportunity to respond, if requested. A judge may:
>
> (a) initiate, permit, or consider ex parte communications as authorized by law;
>
> (b) when circumstances require it, permit ex parte communication for scheduling, administrative, or emergency purposes, but only if the ex parte communication does not address substantive matters and the judge reasonably believes that no party will gain a procedural, substantive, or tactical advantage as a result of the ex parte communication;
>
> (c) obtain the written advice of a disinterested expert on the law, but only after giving advance notice to the parties of the person to be consulted and the subject matter of the

15

> advice and affording the parties reasonable opportunity to object and respond to the notice and to the advice received; or
>
> (d) with the consent of the parties, confer separately with the parties and their counsel in an effort to mediate or settle pending matters.

The Tenth Circuit has recognized the danger of ex parte interactions involving a judicial officer and the potential for ex parte communications to create an impression of bias. "We recognize that ex parte communications may be fraught with peril, and that judges must take great care with respect to ex parte communications even in the most exigent of circumstances ..." *J.B. v. Washington Co.*, 127 F.3d 919, 925–26 (10th Cir. 1997). "Generally, the danger posed by an ex parte communication between a litigant and the court is that the court's impartiality may be compromised by the communication itself and the other litigant's inability to refute or clarify the substance of the communication." *Kaufman v. American Family Mut. Ins.*, 601 F.3d 1088 (10th Cir. 2010).

Courts have held that disqualification is required under circumstances similar to that which occurred here.[2] The Seventh Circuit case of *Edgar v. K.L.*, 93 F.3d 256 (7th Cir. 1996), involved a constitutional challenge to Illinois's then-existing mental health care system. The district court judge appointed, with the parties' consent, a panel of independent experts to meet with patients and employees of the state hospital system and collect data. The parties were aware that the judge would—from time to time—

---

[2] Counsel was unable to locate precedent in this circuit applying § 455(b)(1) to similar facts. But such lack of directly applicable precedent is unsurprising and immaterial as the Tenth Circuit has recognized that cases involving motions for recusal are extremely fact driven and "must be judged on their unique facts and circumstances more than by comparison to situations considered in prior jurisprudence." *Nichols v. Alley*, 71 F.3d 347 (10th Cir. 1995) (quoting *United States v. Jordan*, 49 F.3d 152, 157 (5th Cir. 1995)).

engage in ex parte communications with these experts regarding administrative matters such as compensation and billing. However, when they learned that at least one ex parte meeting may have veered into the substance of the experts' work and potentially involved a discussion of a draft report the experts were preparing, defendants filed a motion to disqualify. The district court judge denied the motion.

The Seventh Circuit held that these ex parte communications with the experts mandated recusal under § 455(b)(1). *Id*. at 259. That the parties had consented to appointment of the experts was immaterial because they did not consent to ex parte communications on the merits of the experts' work. *Id*. at 258-59. The appeals court was troubled by the fact that "[w]hat information [was] passed to the judge, and how reliable it may have been" was unknown. *Id*. at 259. Given the off-the-record nature of these meetings with the experts, the court held that the judge had acquired "personal knowledge" related to the facts of the case, which triggered § 455(b)(1). *Id*.

Similarly, the Third Circuit held that a district court judge abused his discretion in failing to recuse after a series of ex parte communications with advisors to the district court. In *In re Kensington International, Ltd.*, 368 F.3d 289 (3d Cir. 2004), the judge was presiding over a complicated bankruptcy matter that involved the dissolution of five asbestos companies. He retained a number of attorneys versed in the asbestos industry to serve as advisors, essentially in a special master role, and frequently met with them ex parte.

In reversing the denial of the motion to recuse, the Third Circuit noted that ex parte meetings are often unrecorded, which deprives the parties of knowledge of what was discussed and of an official record that permits meaningful review, including on

17

appeal. *Id*. at 309. Moreover, ex parte communications "run contrary to our adversarial trial system" which "plays an indispensable role in our system of justice because a debate between adversaries is often essential to the truth-seeking function of trials." *Id*. The Third Circuit held: "If judges engage in ex parte conversations with the parties or outside experts, the adversary process is not allowed to function properly and there is an increased risk of an incorrect result." *Id*. at 310; *see also Polk County v. Dodson*, 454 U.S. 312, 318 (1981) ("The system assumes that adversarial testing will ultimately advance the public interest in truth and fairness"). The Third Circuit noted that certain ex parte meetings may be appropriate, particularly related to settlement. But when ex parte discussions "veer into the merits, recusal may follow." *Kensington*, 368 F.3d at 307.

Significantly, the advisors with whom the judge engaged in these ex parte discussions were not neutral. Indeed, two of the advisors were involved in related litigation as an advocate. *Id*. at 311. The Third Circuit noted that there was no evidence of unethical conduct or bias on the part of the judicial officer but was concerned that after one of these ex parte meetings with non-neutral advisors (for which there was no record), the judge changed his position on a reorganization plan. *Id*. at 306. Given the advisors' conflicts, and despite the absence of information suggesting the judge was actually biased in favor of or against any party, the Third Circuit held that recusal was required. *Id*. at 305.

**B.     Disqualification is Required Here Given the Judge's Ex Parte Communications with ADX Personnel During the March 24 Tour**

Applying the above precedent to the facts of this case shows that disqualification is required under Section 455(b)(1). Judge Sweeney engaged in multiple ex parte communications with Warden Jones and members of the ADX legal team. Other ADX

18

officers and employees may also have been involved. The first of those conversations occurred in the Warden's office and lasted, by counsel's estimation, more than ten minutes. Based on comments made by the judicial officer later in the tour, it is apparent that this initial ex parte conversation involved a discussion regarding who would be permitted to view the C Unit bubble, and that this ex parte conversation changed the judge's view on this issue. Before the ex parte conversation, the judicial officer took the position that the bubble was an essential part of the tour for everyone involved, including counsel. Ex. B. After the ex parte conversation, the judicial officer reversed course and agreed to exclude the parties' attorneys from the portion of the tour that involved the C Unit bubble.

At the time of the tour, the parties were actively litigating the audio and video monitoring capabilities within Cell 40 on Range 13 and its accompanying areas. The defense had asserted that BOP had the ability to watch and record Mr. Petty through multiple cameras, including a camera in the sallyport area of Cell 40. ECF Nos. 173, 182. The defense also asserted that BOP had the ability to capture audio from Mr. Petty's cell. *Id*. In its responsive pleadings, the government claimed the sallyport camera was inoperable and that there was "no audio file to preserve" in Mr. Petty's cell. ECF Nos. 176, 181.

These issues were pending before the court at the time the judge was privately shown the control room where the video and audio feeds are monitored by staff. No one from Mr. Petty's defense team was permitted to be present during this viewing or to participate in any questioning or conversation that occurred related thereto. No record exists as to this interaction so Mr. Petty lacks knowledge as to what the judge was

shown and what was said during this viewing. The information provided to the judicial officer was not and can never be tested by the adversarial process. And the lack of record also denies him the ability to challenge any statements made during this ex parte conversation and will preclude any review at a later date, which is particularly important in a death penalty case. All of these factors weigh heavily in the disqualification analysis. *See Kensington*, 368 F.3d at 308-09; *Edgar*, 93 F.3d at 257-58.

The then-pending motions are not the only issue likely to be litigated in this case that could implicate the judge's ex parte communications with the ADX personnel in the C Unit bubble. The After-Action Report regarding Mr. Hlilard's death made a number of recommendations with respect to ADX's monitoring of Range 13. *See* Ex. A. Whether these recommendations were implemented will be a contested issue at trial. Whether ADX has mitigated Mr. Petty's risk to other inmates and staff will similarly be disputed, and part of those mitigation efforts includes video and audio monitoring of Mr. Petty on Range 13. That these issues also implicate the information communicated to the judicial officer by ADX personnel during their ex parte communications in the C Unit control room is further indication disqualification is necessary. *See Edgar*, 93 F.3d at 259.

After the ex parte conversation in the C Unit control room, the judicial officer changed her position on another issue, whether counsel would be permitted to see what was behind the door directly across from Mr. Petty's cell. Prior to the tour beginning, the judge had taken the position that all participants needed to see what was behind that door. Ex. B. During the initial part of the tour, it appeared the Warden was standing strong on his position that no one—including the judge—would be shown the area behind this door. But after Warden and the judge emerged from their ex parte interaction

20

in the C Unit bubble, the parties were informed that the Warden had agreed to show the judicial officer and her law clerks the area behind the door across from Mr. Petty's cell but that counsel would be excluded.

Mr. Petty's counsel and the DOJ attorneys were escorted out of C Unit entirely and made to wait in the main hallway while the Judge and her staff remained on Range 13 with the Warden and ADX officers staffing the area. There is no record of what the judicial officer and her staff were shown while counsel was not present. There is no record of the questions asked or conversations that occurred. None of the information conveyed to the judicial officer during this private viewing has been or can be tested by the adversarial process. The purpose and use of this door is an issue that counsel anticipates litigating as this case proceeds. As such litigation will involve issues on which the judicial officer has obtained information from extrajudicial sources, § 455(b)(1) is implicated. *See Edgar*, 93 F.3d at 259.

Given the Judge's ex parte interactions with the ADX officials related to matters at issue in this case, Section 455(b)(1) requires recusal. Counsel acknowledges that not every ex parte communication warrants recusal, particularly where the ex parte information is not likely to impact the judge's decisions. *See J.B. v. Washington County*, 127 F.3d 919, 926 (10th Cir. 1997) (recusal not required when ex parte information received by judicial officer did not impact any decision in the case).[3] But here, the Judge abruptly changed her position on two issues after ex parte communcations with the ADX Warden and members of the ADX legal staff. Mr. Petty's attorneys do not know

---

[3] The *J.B.* case was a 42 U.S.C. §1983 claim involving federal court review of the actions of a state court judicial officer. As such, it was not decided under 28 U.S.C. § 455 and does not apply the same legal standard at issue here.

21

what was discussed during these conversations, but whatever was said affected (or, at minimum, appears to have affected) judicial decisions. As such, recusal is warranted under Section 445(b)(1).

**D.      Mr. Petty Did Not Consent to Ex Parte Communications During the Tour**

The ex parte conversations that occurred on March 24 were not anticipated, planned or disclosed in advance. Mr. Petty did not consent to ex parte communications between the Judge and ADX employees.

The defense acknowledges that they had the opportunity to object to the judge's proposal to tour ADX and did not. But this failure to object was based on the Judge's representation that any such tour would require attendance by both parties' attorneys. *See* ECF No. 140, Trans. of 1/22/26 Conf., p. 8. Mr. Petty understood that his attorneys would be present during each and every stage of that tour. Had the tour proceeded in that manner, the recusal analysis would be different. *See United States v. State of Washington*, 459 F. Supp. 1020, 1095 (W.D. Wash. 1978) (recusal not required when counsel was afforded the ability to be present during "each and every view" the judicial officer was exposed to during a tour of places relevant to ongoing litigation).

Nor can counsel's silence when the ex parte communications occurred be considered consent to such conversations. In *Kensington*, the parties were aware the judge was holding ex parte meetings with advisors and did not object. The Third Circuit held that their silence on this issue did not amount to consent: "While we have no record of any objections being registered at that time, we cannot regard the silence … as manifesting consent. To fulfill the principles and objectives of Canon 3 of the Code of

22

Conduct, which proscribes ex parte communications except with consent, affirmative consent is dictated." *Id*., 368 F.3d at 311.

The issue here is not that the judicial officer toured ADX. The problem is that, during such tour, the judicial officer took part in multiple ex parte conversations with ADX officials interested in and/or involved in this litigation. There is no record of what was said during these ex parte conversations and none of the information conveyed therein has been tested by the adversarial process. The judge's position on multiple issues changed after the ex parte conversations occurred. As the judge has now obtained information from an extrajudicial source about issues that have been or will be disputed in this case, disqualification is mandatory under § 455(b)(1). *See Edgar*, 93 F.3d at 259.

**D.    Recusal is Required Under Section 455(a) Because a Reasonable Person Would Question the Court's Impartiality Following the Ex Parte Communications**

In addition to disqualification being mandatory under § 455(b)(1), disqualification is also appropriate under § 455(a) because a reasonable person would question the court's impartiality after its ex parte interactions with ADX officials during the March 24 tour. Where a judge's impartiality might be reasonably questioned, doubt should be resolved in favor of recusal to protect the integrity of the courts. *Nichols v. Alley*, 71 F.3d 347 (10th Cir. 1995) ("If question of whether a judge's impartiality might reasonably be questioned so as to require his disqualification is a close one, balance tips in favor of recusal."); *Bryce v. Episcopal Church*, 289 f.3d 648, 659 (10th Cir. 2002) ("If the issue of whether § 455 requires disqualification is a close one, the judge must be recused.").

Amongst the issues that has been recognized as contributing to doubt regarding impartiality is the judge as a witness problem. Fundamental fairness is violated where a judge bases a determination of a disputed fact upon his own recollection obtained through extrajudicial means. *Garcia v. Davis*, 2018 WL 5921018 (S.D. Tx. Nov. 9, 2018); *see also* 9 J. Wigmore, Evidence in Trials at Common Law § 2569, at 723 (J. Chabourn rev. ed. 1981) ("It is therefore plainly accepted that the judge is not to use from the bench, under the guise of judicial knowledge, that which he knows *only as an individual* observer outside of court." (emphasis in original)).

Where a judge obtained information from extrajudicial sources that may be relied on to make a decision in a case, "[a] party should be permitted to test a judge's recollection, as a witness presenting factual testimony, as he would any other witness upon cross-examination." *Tyler v. Swenson*, 427 F.2d 412, 415 (8th Cir. 1970). Yet because a judge cannot testify in a case over which they preside, *see* Fed. R. Evid. 605, a litigant cannot confront the adverse evidence relied on to make a decision. Thus, courts have held that due process is violated when a litigant cannot call the presiding judicial officer to the witness stand and examine the judge as to the information that a judge may rely on to make decisions in the case. *Tyler*, 427 F.2d at 415. Recusal is therefore required.

In *State v. Barker*, the trial court judge met with members of the victim's family in chambers after trial but before sentencing. 420 N.W.2d 695 (Neb. 1988). No record was made of the meeting. When defense counsel moved to recuse the judge, the judge recounted what transpired during his meeting with the victim's family and disclaimed any prejudice against the defendant as a result of that meeting. The defendant was

24

given the maximum sentence. On appeal, the court held that recusal was required, even though the judge had disclosed what occurred in the meetings, and even in the absence of any showing of prejudice. *Id.* at 847-48. Recusal was the only remedy because the judge's ex parte off-the-record conversation with the victim's family had converted him into a witness because no one else could testify as to whether the ex parte communication had influenced the sentence imposed. *Id.* at 854.

The same is true here. When the Judge participated in the ex parte viewing of the C Unit bubble on March 24 and the conversation associated therewith, the parties were actively litigating issues related to the audio and video feeds. Two weeks after these ex parte meetings, the Court denied the Defendant's motion to compel audio and video footage and declined to set an evidentiary hearing on this issue to determine the audio and video recording capabilities of ADX on Range 13. There is only one person that can testify whether the ex parte meetings with ADX officials influenced the Court's ruling – the Court itself. This dilemma is precisely why the recusal statute exists, and why recusal is necessary in this case. *Tyler*, 427 F.2d at 416; *Barker*, 420 N.W.2d at 853-54. As more issues continue to be litigated in this case related to ADX policies and practices, this issue is likely to repeat itself.

At minimum, a reasonable person with knowledge of the facts at issue here would question the Court's impartiality. Key to this inquiry is the fact the recusal analysis turns not on whether the judge is actually biased, but whether an appearance of bias exists. *Liteky v. United States*, 510 U.S. 540, 548 (1994). "'If it would appear to a reasonable person that a judge has knowledge of facts that would give him an interest in the litigation then an appearance of partiality is created even though no actual

25

partiality exists because the judge does not recall the facts, because the judge actually has no interest in the case or because the judge is pure in heart and incorruptible.'" *See Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860 (1988) (quoting and affirming *Health Servs. Acquisition Corp. v. Liljeberg*, 796 F.2d 796, 802 (5th Cir. 1986)).

In this case, as set forth in detail above, after the initial ex parte conversation with the ADX Warden and Attorney Willms in the Warden's office, the Judge changed her mind as to whether the parties' attorneys presence was necessary when she viewed the C Unit bubble with ADX staff. After the ex parte conversation with the Warden and Attorney Willms in the bubble, the Judge changed her mind about whether counsel's presence was necessary when she viewed the area behind the door across from Mr. Petty's cell. Whether something the Warden said influenced the judge's decision is unknown, but this sequence of events causes one to reasonably question the judge's impartiality in this matter. Again, as issues related to ADX policies and practices continue to be raised in this case, the same doubt will persist as to whether the judge is relying on extrajudicial information to make her decision.

In *Edgar*, discussed in detail above, the Seventh Circuit held that recusal under § 455(a) was required because "[a] thoughtful observer aware of all of the facts … would conclude that a preview of evidence by a panel of experts who had become partisans carries an unacceptable potential for compromising impartiality." 93 F.3d at 259-60. The same is true here. The Judge had multiple ex parte communications with the ADX Warden and ADX legal staff. These individuals are not neutral observers. There is no record of what they told the Judge about Mr. Petty or other issue pertinent to this case.

26

Like in *Edgar*, a reasonable person would conclude that these ex parte, off-the-record discussions with partisan ADX staff compromised the Judge's impartiality.

The facts of this case are also closely aligned with those in *Kensington*. Like in *Kensington*, the judge's ex parte communications on March 24 were with individuals closely connected to this case. The ADX Warden and ADX legal staff are not disinterested neutrals; they control most aspects of Mr. Petty's life. They have a clear interest in the outcome of this case as it will determine whether ADX is responsible for housing Mr. Petty for the rest of his natural life. They work closely with the investigators and prosecutors on this case. The information they provided to the judge on an ex parte basis—whatever that might have been—cannot be presumed to have been neutral or unbiased. Rather, their position with respect to this litigation is akin to the conflicted advisors in *Kensington*. And it was the fact that the *Kensington* advisors were interested in the litigation that made the ex parte communications improper, and which warranted recusal. *See id*. 368 F.3d at 305. Because the Judge's ex parte communications involved persons closely connected with this litigation, recusal is warranted under § 455(a). *Id*.

The facts of this case are also similar to what occurred in *Duran v. King*, No. 77-721-C, in which plaintiffs moved to disqualify the judge presiding over a lawsuit brought by inmates against the New Mexico prison system related to inadequate medical care, including but not limited to dental care. Ex. D, Order granting motion to recuse. The basis for recusal was the fact that the judge had an ex parte conversation with his dentist, who was also a part-time contract dentist at the facility that was the subject of the litigation, during which the dentist expressed his view that publicity about the

27

litigation was inaccurate and one-sided and that the facility was 75-80% in compliance with the consent decree. *Id*. at 7. Plaintiffs alleged this ex parte communication called the judge's impartiality into question such that recusal was required under § 455(a). *Id*. at 9.

Judge Finesilver of the Colorado District Court was appointed by the Tenth Circuit to decide the recusal motion. Judge Finesilver found "no evidence to support a finding of actual bias, prejudice or wrongdoing" but held that recusal was required because his impartiality "might reasonably be questioned." *Id*. at 12. In addition to concerns about the personal relationship between the dentist and the judge, the court held "[t]he circumstances surrounding the ex parte communication on prison dental care reinforce the conclusion that recusal is required here." *Id*. at 15. The court quoted the judicial canon prohibiting ex parte communications concerning pending proceedings and noted that the judge's ex parte conversation with the dentist risked causing a reasonable person to question the impartiality of the court. *Id*. at 15-16.

There are distinct parallels between the *Duran* case and what occurred here. Like in *Duran*, the judge here engaged in ex parte communications with employees of a penal institution where the events at issue occurred. Like in *Duran*, those communications related directly to issues that were in dispute at the time the conversation occurred. While motions related to audio and video capabilities were pending, the judge participated in an ex parte viewing of the C Unit bubble and had ex parte communications with ADX employees related thereto. Even in the absence of any evidence of actual bias, the appearance of bias caused by these events requires recusal.

28

**Conclusion**

As this Court recently noted, "death cases are indeed different in kind from all other litigation," and this Court "treats this case with the utmost seriousness." ECF No. 195 at 3 (quoting *Coleman v. Balkcom*, 451 U.S. 949, 953 (1981)).

Given the gravity of this matter, the protections of due process are paramount. Mr. Petty is entitled to a disinterested tribunal whose impartiality cannot reasonably be questioned. After March 24, this Court cannot serve such function. Mr. Petty therefore moves the Court to disqualify itself from all further proceedings.

DATED: April 24, 2026                              Respectfully submitted,

_s/ Tim Burdick_                                    *s/Jamie Hubbard*
                                                    *s/ Kathyrn Stimson*
Tim Burdick, #78152                                 Jamie Hubbard, #48552
Assistant Federal Public Defender                   Kathryn Stimson, #36783
500 State Avenue, Suite 201                          Stimson LaBranche Hubbard, LLC
Kansas City, KS 66101                               1652 Downing Street
913-551-6712                                        Denver, Colorado 80218
Tim_Burdick@fd.org                                  720-689-8909
                                                    Hubbard@slhlegal.com
                                                    stimson@slhlegal.com

                                                    *Attorneys for Ishmael Petty*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 24, 2026, a true copy of the foregoing document was electronically filed via CM/ECF system which will a notice of electronic filing to all interested parties.

                                                    _s/ Nancy Hickam_
                                                    Nancy Hickam, Paralegal

29